Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Eastern District of New York                                    1:20-cv-02537

| | |
|---|---|
| Vanya Cleary, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Complaint |
| Wakefern Food Corp., | |
| Defendant | |

    Plaintiff by attorneys allege upon information and belief, except for allegations pertaining

to plaintiff, which are based on personal knowledge:

    1.    Wakefern Food Corp. ("defendant") manufactures, distributes, markets, labels and

sells Unsweetened Vanilla Almond Milk under its Wholesome Pantry brand ("Product").

    2.    The Product is available to consumers from defendant's retail stores which number

close to four hundred (400) and include ShopRite, Price Rite Marketplace, The Fresh Grocer,

Dearborn Market and Gourmet Garage in New Jersey, New York, Connecticut, Pennsylvania,

Maryland, Delaware, Massachusetts, New Hampshire, Rhode Island, and Virginia, and is sold in

cartons of 32 OZ and 64 OZ.

3.    The relevant front label representations include "Wholesome Pantry," "Unsweetened Vanilla Almond Milk," and a vignette of vanilla bean pods and a vanilla flower.



4.    The representation of the Product's flavor as "Vanilla" is misleading because it contains less vanilla than expected relative to its total flavoring and its vanilla taste is mainly provided by non-vanilla flavors, not disclosed to consumers.

I.   Increase in Consumption of Non-Dairy, Plant-Based Milk Alternatives

5.    Over the past ten years, the number of dairy milk substitutes has proliferated to include "milks" (milk-like beverages) made from various agricultural commodities.

6.    Reasons for consuming non-dairy milks include avoidance of animal products due to health, environmental or ethical reasons, dietary goals or food allergies.[1]

7.    Two of the most popular milk alternatives are made from soybeans and almonds.

8.    Reasons for consumers choosing soymilk instead of almondmilk include tree nut allergies, creamier consistency, greater amount of soy protein and more B vitamins, magnesium and potassium.[2]

9.    Reasons for consumers choosing almondmilk instead of soymilk include soy allergies, sweeter taste, similar consistency to skim and low-fat milk, nutty flavor and higher levels of vitamin E.

10.    Recent studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts while 1.5 million are allergic to soy.[3]

11.    Whether due to few people being allergic to soy and tree nuts (almonds) or the different qualities of each product type, consumers have preferences for one over the other and seldom switch between their "plant milk" of choice.

12.    Consumers have strong preferences for their "plant milk" of choice due to allergenic concerns and seldom switch between types.

II.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

13.    The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla.

14.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients

---

[1] Margaret J. Schuster, et al. "Comparison of the Nutrient Content of Cow's Milk and Nondairy Milk Alternatives: What's the Difference?," *Nutrition Today* 53.4 (2018): 153-159.
[2]   Yahoo Food, Almond Milk Vs. Soy Milk: Which Is Better?, September 5, 2014.
[3] Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.

used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[16]

15.    Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[17]

16.    It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[18]

17.    This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

18.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[19]

19.    Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

---

[16] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

[17] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[18] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[19] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

A. Food Fraud as Applied to Vanilla

20. Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[20]

21. The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[21]

| Type of Food Fraud | Application to Vanilla |
| --- | --- |
| ➢ Addition of markers specifically tested for | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[22] |
| ➢ Substitution and replacement of a high-quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |

---

[20] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.

[21] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.

[22] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component

- Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla

➢ Compounding, Diluting, Extending

- "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[23]
- Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[24]
- "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark

➢ Addition of fillers to give the impression there is more of the product than there actually is

- Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County

➢ Ingredient List Deception[25]

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list
  o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics
  o "natural vanilla flavorings" – "-ing" as suffix referring

---

[23] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[24] Berenstein, 423.
[25] A recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

to something *like* that which is described

- o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food

- o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor

- o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

22.   This "plasticity of legal reasoning" with respect to food fraud epitomizes what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

> the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

*The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[26]

III.   Consumer Protection through Truthful Disclosure

23.   Prior to adoption of the vanilla standards, "the widespread and exceedingly serious adulteration of vanilla extracts that are now labeled 'pure'…deprive[d] the consumer of value the product is represented to have, and for which the consumer pays.[27]

24.   These practices were chronicled in Notices of Judgment issued by the Department of Agriculture against manufacturers who passed off imitation vanilla products:

---

[26] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

[27] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Memorandum of Telephone Conversation between Mr. Alfred Daibock, Commercial Policy Division, Department of State and Tom Bellis, Food Standards Branch, FDA (the FDA stated, "The prime purpose sought to be served by the standards adopted was to promote honest, fair dealing with housewives and other consumers of the flavorings covered by the standards").

Misbranding was alleged for the further reason that the product was labeled and branded so as to deceive and mislead the purchaser thereof, in that said label was calculated and intended to create the impression and belief in the mind of the purchaser that the product was a genuine vanilla extract, whereas, in fact, it was a mixture of vanilla extract, vanillin, and coumarin, artificially colored with caramel.

Notice of Judgment No. 2241, Adulteration and Misbranding of…Vanilla Extract, United States Department of Agriculture, W. M. Hays, Acting Secretary, Washington, D.C., January 23, 1913.

25.    To prevent consumer deception when purchasing products labeled as "vanilla," standards of identity were established which fixed the composition of vanilla ingredients. See 21 U.S.C. §343(g) (requiring that where a food "purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations," it must "conform[s] to such definition and standard" and must be labeled with "the name of the food specified in the definition and standard.").

26.    The purpose of the standards was to enable consumers to quickly compare a variety of similar-looking products by only looking at the front label.

27.    The vanilla standards were intended to "insure, for the protection of both the consumers and our industry, that all vanilla products are correctly labeled and meet at least minimum standards."[28] See 21 C.F.R. §169.3(c) referencing 21 C.F.R. §169.3(b) (a "*unit of vanilla constituent* means the total sapid and odorous principles extractable from one unit weight of vanilla beans," or 13.35 ounces); *see also* 21 C.F.R. Part 169 ("Food dressings and flavorings"); 21 C.F.R. §169.3 ("Definitions"); 21 C.F.R. § 169.175 – 21 C.F.R. § 169.182 (vanilla products).

28.    New York incorporated the federal standards for vanilla products. *See* 1 NYCRR § 250.1(a)(17) ("the commissioner hereby adopts the following as the standards of identity and/or standards of quality, and tolerances for food and food products as published in title 21 of the Code

_____

[28] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Press Release U.S. Department of Health, Education, and Welfare, September 13, 1963.

of Federal Regulations…21 CFR part 169, containing the Federal definitions and standards for *Food Dressings and Flavorings* at pages 600-606.") (italics in original).[29]

29.    All food products are required to have "common or usual name" which "accurately identif[ies] or describe[s], in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." *See* 21 C.F.R. § 102.5(a); adopted in entirety by New York at 1 NYCRR § 259.1(a)(4) ("the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(4) Part 102 of title 21 of the Code of Federal Regulations, containing the Federal definitions and standards for Common or Usual Name for Nonstandardized Foods at pages 173-180.").[30]

30.    Where a product makes a representation as to its primary flavor, the truthful and non-misleading designation of that flavor is required to become part of the common or usual name. *See* 21 C.F.R. § 101.22(i)(1) ("If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor…"); 1 NYCRR § 259.1(a)(3) ("the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations…in the area of food packaging and labeling as follows…(3) Part 101 of title 21 of the Code of Federal Regulations, containing the Federal definitions and standards for Food

---

[29] 1 NYCRR § 250.1(a)(17), Section 250.1, Foods, Part 250, Definitions and Standards, Subchapter C, Food and Food Products, Chapter VI, Food Control, Title 1.
[30] 1 NYCRR § 259.1(a)(4), Section 259.1, Packaging and labeling of food, Part 259, Packaging and labeling of food, Subchapter C, Food and Food Products, Chapter VI, Food Control, Title 1.

Labeling (including Appendices) at pages 10-172.")

31.   The result is that New York State labeling requirements for this Product are identical to their federal counterparts.

IV.   Shortage of Vanilla Leads to Cut Corners and Consumer Deception

32.   For decades, The Flavor and Extract Manufacturers Association ("FEMA") protected consumers from misleading vanilla labeling through "self-policing," where companies were accountable to industry standards which followed federal regulations.

33.   However, FEMA was forced to abandon these efforts and disband its Vanilla Committee due to alleged financial pressure from its largest members.

34.   Into this gap, flavor and food companies quickly reverted to practices which had been eradicated with the promulgation of the vanilla standards in the early 1960s.

35.   The recent global shortage of vanilla beans has provided the flavor industry new ways to "innovate[ing] natural vanilla solutions…to protect our existing customers."[31]

36.   When less vanilla is available, customers of flavor companies – food manufacturers – must purchase higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

37.   According to Suzanne Johnson, vice president of research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

38.   The head of "taste solutions" at Irish conglomerate Kerry plc, urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

---

[31] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

39.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[32]

40.    These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including "naturally produced vanillin," maltol and piperonal, blended together so that consumers believe what they are tasting is real vanilla.[33]

V.    "Vanilla" Without Qualification Tells Consumers All of Product's Flavor and Vanilla Taste is from Vanilla Beans

41.    Vanilla's unique flavor and aroma is due to at least 200 compounds scientists have identified.[35]

42.    These include volatile constituents such as "acids, ethers, alcohols, acetals, heterocyclics, phenolics, hydrocarbons, esters and carbonyls."

43.    The non-volatile constituents include "tannins, polyphenols, free amino acids and resins."

44.    Re-creating the complexity and richness of "vanilla flavor" provided by the ingredient of vanilla beans is a task that science has been unable to duplicate, which is why consumers are willing to pay more for products labeled solely with the term "Vanilla."

45.    Consumers are primarily familiar with vanilla through the purchase and use of vanilla extract, which contains only the extractives of vanilla beans. 21 C.F.R. § 169.175 ("Vanilla extract").

---

[32] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[33] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).
[35] Arun K. Sinha et al., "A comprehensive review on vanilla flavor: extraction, isolation and quantification of vanillin and other constituents," International Journal of Food Sciences and Nutrition 59.4 (2008): 299-326.

46.     Regulations which control how flavoring is declared recognize that consumers are entitled to – and should – know the source of a product's flavor. *See* 21 C.F.R. § 101.22(i)(1) (describing a characterizing flavor which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-(iii));

47.     Where a product's front label lacks terms such as "flavored," "naturally flavored," "artificial flavors" and "with other natural flavors," consumers will expect the flavor is derived exclusively from the characterizing food ingredient

48.     Where a food is "commonly expected to contain a characterizing food ingredient, e.g., strawberries in 'strawberry shortcake'" or vanilla in vanilla almondmilk, and it contains enough of those ingredients to "independently characterize the food," the front label will only say "vanilla" or "strawberry." *See* 21 C.F.R. § 101.22(i)(1)(i) ("If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in 'strawberry shortcake', and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food")

49.     Consumers expect the Product's flavor to be supplied only from the characterizing food ingredient of vanilla beans because (1) the label lacks qualifiers such as "flavored," "naturally flavored," "artificial flavors" and "with other natural flavors" and (2) vanilla's standard of identity and its consistent usage gives consumers the impression it contains an exclusively vanilla standardized ingredient. *See* 21 C.F.R. § 101.22(i)(1)(i) ("e.g., 'natural strawberry flavored shortcake,' or 'strawberry flavored shortcake'."); 21 C.F.R. § 101.22(i)(1)(ii) and 21 C.F.R. § 101.22(i)(2) ("artificially flavored"); 21 C.F.R. § 101.22(i)(1)(iii) ("with other natural flavor"); *see also* 21 U.S.C. §343(g).

VI.    Product Contains Undisclosed Non-Vanilla Flavors Which Misleads Consumers

50.    However, the actual flavor ingredients in the Product include non-vanilla flavors which contribute to and supply its vanilla taste, in contrast to the expectation that all of its vanilla taste was provided by vanilla beans.

51.    The Product's flavor ingredient does not "conform[s] to such definition and standard" of vanilla and "its label [fails to] bear[s] the name of the food specified in the definition and standard. See 21 U.S.C. §343(g); see also 21 C.F.R. § 169.175 (a) (defining vanilla extract as "the solution in aqueous ethyl alcohol of the sapid and odorous principles extractable from vanilla beans," with not less than 35 percent ethyl alcohol and a "content of vanilla constituent, as defined in 169.3(c), [is] not less than one unit per gallon"); 21 C.F.R. § 169.177 (a) (defining "vanilla flavoring" as identical to "vanilla extract" "except that its content of ethyl alcohol is less than 35 percent by volume").

52.    The non-vanilla flavors not disclosed on the front label are evident through an analysis of the ingredient list coupled with a careful reading of the regulations. *See* 21 C.F.R. § 101.4(a)(1) ("designation of ingredients").



**INGREDIENTS:** ALMONDMILK (FILTERED WATER, ALMONDS), NATURAL FLAVOR, SEA SALT, GELLAN GUM, XANTHAM GUM, SUNFLOWER LECITHIN, CALCIUM CARBONATE, VITAMIN E ACETATE, ZINC GLUCONATE, VITAMIN A PALMITATE, VITAMIN B12, VITAMIN D2.

53.    That "Natural Flavor" does not refer to an exclusively vanilla ingredient is discerned

through careful reading of the regulations. *See* 21 C.F.R. § 101.4(a)(1) ("designation of ingredients").

54.    Because all ingredients are required to be "listed by common or usual name," and the names for the exclusively vanilla standardized foods are "vanilla extract" and "vanilla flavoring," the Product admittedly does not contain such an ingredient as the sole source of flavoring. S*ee* 21 C.F.R. § 101.4(a)(1); 21 C.F.R. § 169.175(b)(1) ("The specified name of the food is 'Vanilla extract' or 'Extract of vanilla'."); 21 C.F.R. § 169.177(b) ("The specified name of the food is 'Vanilla flavoring.'"); *see also* 21 C.F.R. § 101.4(b)(1) (the "name of an ingredient shall be a specific name and not a collective (generic) name," subject to various exceptions).

55.    Flavorings other than vanilla "shall be declared according to the provisions of 101.22." *See* 21 C.F.R. § 101.4(b)(1) (the "name of an ingredient shall be a specific name and not a collective (generic) name," subject to various exceptions); *see also* 21 C.F.R. § 101.22(h)(1) ("The label of a food to which flavor is added shall declare the flavor in the statement of ingredients in the following way...Spice, natural flavor, and artificial flavor may be declared as "spice", "natural flavor", or "artificial flavor", or any combination thereof, as the case may be.").

56.    "Natural flavor" is the term used for a combination flavor that may contain vanilla and non-vanilla natural flavors. *See* 21 C.F.R. § 101.22(h)(1) ("Spice, natural flavor, and artificial flavor may be declared as 'spice', 'natural flavor', or 'artificial flavor', or any combination thereof, as the case may be.").

57.    The labeling distinction between vanilla and non-vanilla flavorings – 21 C.F.R. § 101.22(h)(1) – is recognized in 21 U.S.C. § 343.  *See* 21 U.S.C. § 343(g) (applies to foods which purport to be a standardized food, which include the vanilla products) *but see* 21 U.S.C. § 343(i) (applies to foods which have "no representation as to definition and standard of identity," and

stating that "spices, flavorings, and colors…may be designated as spices, flavorings, and colorings without naming each.").

VII.    Front Label and Ingredient List Fails to Disclose Artificial, Non-Vanilla Flavors

58.    The only plausible way the Product could contain an unqualified "Vanilla" on the front label is if the "Natural Flavor" contains non-vanilla flavors that have no effect on the Product's vanilla taste.

59.    For instance, if the natural flavor contained strawberry flavor, the front label would not be required to disclose any other flavors, because the Product makes no representations related to a strawberry flavor.

60.    This example is used to show that the non-vanilla flavors combined with any vanilla flavors are those which affect the amount of vanilla used in the Product.

61.    The "Natural Flavor" used is an ingredient designated in the trade as "Vanilla With Other Natural Flavor" or "Vanilla WONF."

62.    Vanilla WONF refers to an ingredient that contains *some* vanilla and "other natural flavors" from non-vanilla sources which enhance and resemble vanilla, allowing a product to provide less vanilla.

63.    Generally, where a food contains some flavor "from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor," the front label is required to be labeled with the term "with other natural flavor" or "WONF." *See* 21 C.F.R. § 101.22(i)(1)(iii) ("If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed

by the words 'with other natural flavor'").

64.    The "WONF" label and flavorings do not apply to vanilla products in the same way they do for non-vanilla flavors because vanilla products are not controlled by the general flavoring regulations but by the vanilla standards. *Compare* 21 C.F.R. § 101.22 with 21 C.F.R. § 169.175- 21 C.F.R. § 169.182 (vanilla products).

65.    "WONF" is not applicable to vanilla because the standards are intended to prevent "other natural flavors" – including vanillin, maltol, piperonal, coumarin – from spiking a trace amount of vanilla, such that consumers may be unable to tell they were paying for vanilla yet receiving imitation vanilla flavors.

66.    Defendant's "other natural flavors" are actually artificial flavors and are unable to match the over 200 unique flavor compounds in vanilla, which means the Product's taste and flavor cannot equal the flavor and taste from real vanilla.

67.    Though defendant has purportedly added "other natural flavors" to vanilla, the standards of identity for vanilla ingredients allow only glycerin, propylene glycol, sugar, dextrose, corn sirup or vanillin. *See* 21 C.F.R. § 169.175(a)(1)-(5) (ingredients permitted for addition to vanilla extract); *see also* 21 C.F.R. § 169.180(a) (permitting "not more than 1 ounce of added vanillin" for "each unit of vanilla constituent, as defined in 169.3(c)" in the combination labeled "Vanilla-vanillin extract."); *see also* 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'.").

68.    Defendant's Product includes vanillin, an artificial flavor.

69.    Defendant's ingredient list omits the required disclosure when vanillin is added to vanilla – "contains vanillin, an artificial flavor (or flavoring)." *See* Vanilla-vanillin extract at 21

C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'.").

70.    Defendant's front label misleads consumers by not containing the statement "artificially flavored," because it contains vanillin added to vanilla.

71.    The vanillin used in the Product is not "natural vanillin," as defined in 21 CFR 101.22(a)(3), because it is not obtained from vanilla beans, whose flavor it simulates.

72.    According to representatives of FEMA:

The standards for vanilla extract and the other standardized vanilla products at 21 CFR 169 expressly do not provide WONF designation. This means that a flavoring mixture of vanilla extract and vanillin produced through a "natural" process (i.e. a process consistent with the definition of natural flavor at 21 CFR Section 101.22(a)(3)) cannot be described as "vanilla extract WONF," "vanilla WONF" or other similar descriptive terms.

John B. Hallagan and Joanna Drake, The Flavor and Extract Manufacturers Association of the United States, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018.

73.    Defendant's "natural flavor" refers to a mixture of vanilla, vanillin, an artificial flavor and "other natural flavors," but the term "natural flavor" misleads consumers.

74.    If consumers read "natural flavor" with the unqualified front label of "vanilla," they will get the impression the flavor is only from vanilla beans, which is false.

75.    Plaintiff and reasonable consumers cannot follow up or "learn the truth" that the Product contains artificial flavors such as vanillin and maltol from reading the Product's ingredient list because defendant incorrectly and deceptively labels this ingredient as "Natural Flavor."

VIII.   Conclusion

76.   Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

77.   Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers like plaintiff.

78.   The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

79.   Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

80.   As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.49 and $3.49 for cartons of 32 OZ and 64 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

81.   Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

82.   Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

83.   Plaintiff Vanya Cleary is a citizen of Brooklyn, Kings County, New York.

84.   Defendant Wakefern Food Corp. is a New Jersey corporation with a principal place of business in Keasbey, Middlesex County, New Jersey and is a citizen of New Jersey.

85.   Diversity exists because plaintiff and defendant are citizens of different states.

86. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred, *viz*, Plaintiff's purchase of the Product and the misleading representations relied upon, were first known in this district.

87. The Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York and this district.

Parties

88. Plaintiff Vanya Cleary is a citizen of Brooklyn, Kings County, New York.

89. Defendant Wakefern Food Corp. is a corporation which operates the largest retailers' cooperative group of supermarkets in the United States – roughly four hundred (400) – including ShopRite, Price Rite Marketplace, The Fresh Grocer, Dearborn Market and Gourmet Garage.

90. Defendant's private label products include those marketed under the "Wholesome Pantry" brand.

91. During the relevant statutes of limitations, plaintiff purchased the Product within her district and/or State for personal consumption and/or use in reliance on the representations the Product contained flavor only from vanilla beans because that is what the front label said.

92. Plaintiff Vanya Cleary purchased the Wholesome Pantry Unsweetened Vanilla Almond Milk at Shoprite in Kings County, New York in or around March 2020, for no less than the price identified above per OZ.

93. Plaintiff would buy the Product again if assured it did not contain non-vanilla flavors and artificial flavors.

## Class Allegations

94.   The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations.

95.   Plaintiff seeks to certify a class under Federal Rules of Civil Procedure 23(b) seeking injunctive relief.

96.   Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

97.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

98.   Plaintiff is an adequate representatives because her interests do not conflict with other members.

99.   No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

100.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

101.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

102.  Plaintiff seeks class-wide injunctive relief because the practices continue.

## New York General Business Law ("GBL"), §§ 349 & 350
### (Consumer Protection Statutes)

103.  Plaintiff incorporates by reference all preceding paragraphs.

104.  Plaintiff and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

105.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

106.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

107.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product because consumers expect a food labeled "vanilla" to contain flavoring only from vanilla and will pay more for such Products.

108.  Plaintiff relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

109.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

110.  Plaintiff incorporates by reference all preceding paragraphs.

111.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

112.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product because consumers expect a food labeled "vanilla" to contain flavoring only from vanilla and will pay more for such Products.

113.  Defendant had a duty to disclose and/or provide non-deceptive marketing of the Product and knew or should have known same were false or misleading.

114.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

115.  The representations took advantage of consumers' cognitive shortcuts made at the

point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

116.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

117.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

118.  Plaintiff incorporates by reference all preceding paragraphs.

119.  The Product was manufactured, labeled and sold by defendant and warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

120.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product because consumers expect a food labeled "vanilla" to contain flavoring only from vanilla and will pay more for such Products.

121.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

122.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

123.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

124.  The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

125.  Plaintiff and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

<u>Fraud</u>

126.  Plaintiff incorporates by reference all preceding paragraphs.

127.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product because consumers expect a food labeled "vanilla" to contain flavoring only from vanilla and will pay more for such Products.

128.  Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front labels, when it knew its statements were neither true nor accurate and would mislead consumers.

129.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

130.  Plaintiff incorporates by reference all preceding paragraphs.

131.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   June 7, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

1:20-cv-02537
United States District Court
Eastern District of New York

Vanya Cleary, individually and on behalf of all others similarly situated,

                        Plaintiff,

        - against -

Wakefern Food Corp.,

                        Defendant

## Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
    Tel: (516) 303-0552
    Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: June 7, 2020

                                        /s/ Spencer Sheehan
                                        Spencer Sheehan